**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| In re: Case No. A05-00373-DMD<br><br>BERND D. HOFFMANN,<br><br>    Debtor. | Chapter 7 |
| BETHEL NATIVE CORPORATION,<br><br>    Plaintiff and<br>    Counter-defendant,<br><br>    v.<br><br>BERND D. HOFFMANN,<br><br>    Defendant and<br>    Counter-claimant. | Adversary No. A05-90023-DMD<br><br>**Filed On**<br>**8/9/06** |

**AMENDED MEMORANDUM DECISION**

      This is an action for exception of a debt from discharge under 11 U.S.C. § 523(a)(4) and denial of discharge under 11 U.S.C. § 727(a)(2). It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J). Jurisdiction arises from 28 U.S.C. § 1334(b) and the district court's order of reference. I find for the plaintiff on both claims.

Background

Defendant Bernd Hoffmann has been a property manager in Anchorage for many years. He was the sole owner and director of Hoffmann Commercial, Inc. ("HCI"). Plaintiff Bethel Native Corporation ("BNC") owned Anchorage real property and was a client of Hoffmann's. BNC sought to diversify its real property holdings. Hoffmann recommended that BNC invest in an income property located in Albuquerque, New Mexico, named Central Park. The debtor and HCI served as general partner for the project. HCI was also the property manager for the project.[1]

BNC invested in Central Park as a limited partner along with other native corporations. Their collective initial investment totaled over $2.4 million. The project faired very poorly. BNC lost its share of the initial investment as well as several large loans it made to the partnership. BNC sued Hoffmann and HCI in state court, ultimately recovering a judgment for $669,423.51. The judgment was based on damages from a variety of claims. Hoffmann owed BNC rent from BNC's Anchorage office building. Hoffmann also owed BNC $350,000.00 for a Northrim bank loan to Central Park that was never repaid.[2] BNC also made direct loans of $70,000.00 to Central Park that were never repaid. The state court

---

[1] When the original management contract was signed in 1995, HCI was known as Hoffmann Commercial Management.

[2] BNC had to pay Northrim over $411,000.00 to satisfy the loan.

found in favor of BNC on all of these claims, and awarded BNC pre-judgment interest and attorney's fees as well.[3]

HCI went in and out of chapter 11 proceedings. It filed a chapter 11 petition on January 30, 2003.[4] HCI's case was dismissed on motion of the United States Trustee on May 6, 2004. On September 1, 2004, while BNC's claim was still pending in state court, HCI transferred all of its assets to AREC, LLC.[5] AREC is owned 100% by Hoffmann's wife, Christine. After the transfer to AREC, HCI ceased all business operations. Hoffmann filed for personal chapter 7 relief on April 6, 2005. This adversary proceeding ensued.

Exception to Discharge

BNC alleges Hoffmann's debts to it arise from fraud or defalcation while Hoffmann was acting in a fiduciary capacity. 11 U.S.C. § 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

> The meaning of "fiduciary capacity" under section 523(a)(4) is a question of federal law, which has consistently limited this term to express or technical trust relationships. The broad general definition of a fiduciary relationship – one involving confidence, trust and good faith – is inapplicable in the

---

[3]This court takes judicial notice of the state court action *Bethel Native Corp. v. Hoffmann, et al.,* Case No. 3AN-03-10782 CI in the Superior Court for the State of Alaska, Third Judicial District at Anchorage.

[4]Case No. 03-00084-HAR.

[5]HCI's most valuable assets consisted of homeowner association management contracts. These contracts generated monthly income of more than $27,500.00.

dischargeability context. The debt alleged to be non-dischargeable must arise from a breach of trust obligations imposed by law, separate and distinct from any breach of contract. In addition, the requisite trust relationship must exist prior to and without reference to the act of wrongdoing. This requirement eliminates constructive, resulting or implied trusts.

Although the concept of "fiduciary" in the dischargeability context is a narrowly defined question of federal law, courts look to state law to determine whether the requisite trust relationship exists. If state law creates an express or technical trust relationship between the debtor and another party and imposes trustee status upon the debtor, the debtor will be a fiduciary under section 523(a)(4). The statute must define the trust res, spell out the trustee's fiduciary duties and impose a trust prior to and without reference to the wrong which created the debt.[6]

Under Alaska law, an express or a technical trust relationship existed between the debtor and BNC. The debtor served as a general partner for the Central Park limited partnership. Alaska case law recognizes a fiduciary relationship among partners.[7] A.S. 32.06.404(b)(1) further provides that a partner holds any property derived from partnership business "as a trustee" for the partnership.

---

[6]*Woodworking Enter., Inc. v. Baird (In re Baird)*, 114 B.R. 198, 202 (B.A.P. 9th Cir. 1990) (citations omitted).

[7]*Old Harbor Native Corp. v. Afognak Joint Venture*, 30 P.3d 101, 106 n.18 (Alaska 2001); *Munn v. Thornton*, 956 P.2d 1213, 1220 (Alaska 1998). Other courts have also found general partners to be fiduciaries under § 523(a)(4). *See Lewis v. Scott (In re Lewis)*, 97 F.3d 1182 (9th Cir. 1996) (Arizona partner was a fiduciary); *Bugna v. McArthur (In re Bugna)*, 33 F.3d. 1054 (9th Cir. 1994) (California partner and real estate broker was a fiduciary); *Abrams v. Sea Palms Assoc., Ltd. (In re Abrams)*, 229 B.R. 784 (B.A.P. 9th Cir. 1999) (California general partner of limited partnership was a fiduciary).

Although HCI was property manager for BNC, property management contracts must be in writing and signed by a real estate broker.[8] Hoffmann was the broker for HCI's contracts. A broker owes a fiduciary duty to clients under Alaska case law.[9] A.S. 08.88.351(3) requires brokers to keep separate trust accounts for rental receipts and other money collected in trust. I conclude that Hoffmann, as a general partner and broker, was a fiduciary within the meaning of 11 U.S.C. § 523(a)(4).

Did Hoffmann commit a defalcation while acting as a fiduciary? The Ninth Circuit has stated:

> Defalcation is defined as the "misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to properly account for such funds." *Black's Law Dictionary* 417 (6th ed. 1990). Under section 523(a)(4), defalcation "includes the innocent default of a fiduciary who fails to account fully for money received." *In re Short*, 818 F.2d at 694 (citation omitted); *In re Baird*, 114 B.R. 198, 204 (9th Cir. BAP 1990) ("In the context of section 523(a)(4), the term 'defalcation' includes innocent, as well as intentional or negligent defaults so as to reach the conduct of all fiduciaries who were short in their accounts"). To the extent *In re Martin*, 161 B.R. 672, 678 (9th Cir. BAP 1993), conflicts with this standard, it is overruled. An individual may be liable for defalcation without having the intent to defraud.[10]

---

[8] A.S. 08.88.341.

[9] *Black v. Dahl*, 625 P.2d 876, 880 (Alaska 1981).

[10] *Lewis*, 97 F.3d at 1186-87.

5

Hoffmann received $350,000.00 from a Northrim bank loan cosigned by BNC and $70,000.00 in direct loans from BNC. Because BNC has shown that those funds were entrusted to Hoffmann, the burden to render an accounting shifts to Hoffmann.[11]

> Once the fiduciary relationship is established, the burden is on the defendant to show that he has performed his duties properly . . . The defendant thus could not escape liability simply by remaining silent or by testifying generally that funds were not misappropriated. Instead, the fiduciary was under a duty to render an account that should show in detail the items expended and show when, to whom, and for what purposes the payments were made so the beneficiaries can make a reasonable test of the accuracy of the accounts. The accounts should be clear and accurate and if they are not, all presumptions are against the trustee and all obscurities and doubts are to be taken adversely to him.[12]

Hoffmann denies any wrongdoing or misappropriation of funds. He has failed, however, to accurately account for the $350,000.00 Northrim loan or the $70,000.00 in direct loans from BNC. The Central Park balance sheets, cash flow statements and budget comparisons[13] do not provide a clear and accurate statement of account. The statements are inconsistent, inaccurate and incomplete. They can't be reconciled with the line of credit

---

[11]*Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1461 (9th Cir. 1997).

[12]*Id.* at 1461 n.4, *citing Alexopoulos v. Dakouras,* 48 Wis.2d 32, 179 N.W.2d 836, 841 (1970) (citation omitted).

[13]Plaintiff's Ex. 59 consists of Central Park balance sheets for March, April, August and December of 2000, March, May, July, September and December of 2001, and August of 2002. There are cash flow statements for December of 2000 and 2001 and January 2002. There are documents called "budget comparisons" for March, April, August, and December 2000, and February, March, May, July, September and December 2001.

history Hoffmann prepared.[14] They don't show when, to whom and for what purposes payments were made. There is no clear explanation of how the $420,000.00 in loans was spent. Hoffmann cannot show where the money went and has breached his fiduciary duty to BNC. The debts, which totaled $507,340.47 as of August 22, 2003, are excepted from discharge.[15]

Objection to Discharge

11 U.S.C. § 727(a)(2) precludes the grant of a discharge if a debtor, with the intent to hinder, delay or defraud a creditor, has transferred property of the debtor within one year of the date of the petition. Hoffmann filed for chapter 7 relief on April 6, 2005. His corporation, HCI, transferred all of its assets to his wife's corporation, AREC, LLC, within one year of Hoffmann's bankruptcy filing. I find the transfer was made to hinder BNC and its claims against Hoffmann and HCI. Hoffmann contends that § 727(a)(2) does not apply because corporate property rather than his own property was transferred.[16] I disagree.

---

[14] Plaintiff's Ex. 63.

[15] I base my calculation of damages on the pleadings in the state court file and the state court's judgment.

[16] *MCorp. Mgmt. Solutions, Inc. v. Thurman (In re Thurman)*, 901 F.2d 839 (10th Cir. 1990) supports his theory.

7

Judge Ross faced a similar situation in *Compton v. Bonham (In re Bonham)*.[17] Bonham made fraudulent transfers of corporate property from two corporations. She disregarded corporate formalities and used corporate funds for her personal expenses. She contended she was entitled to a chapter 7 discharge because she did not fraudulently transfer her own personal property. Judge Ross denied her discharge, stating, "In Alaska, a person who uses a corporation to commit fraud or engage in criminal activity should not be permitted to hide behind the corporate veil. Rather, the person should be treated as the corporation's alter ego."[18]

The same result is justified here. There are abundant grounds for piercing the corporate veil in this case. Hoffmann was the sole shareholder and director of HCI. HCI had grossly inadequate capital. Corporate formalities were ignored. Minutes of HCI's annual meetings were manufactured only after BNC was served with discovery requests in this case.

Hoffmann transferred HCI's most valuable assets to his wife's corporation for nothing other than AREC's promise to pay 941 taxes and fees due his attorney. His wife paid nothing for her stock in AREC, LLC. She now draws a salary of $8,000.00 a month. Hoffmann's transfer of HCI's assets perpetuated a fraud against BNC. It was made within

---

[17]224 B.R. 114 (Bankr. D. Alaska 1998). Other courts have also found that a transfer of assets of a wholly owned corporation constitutes grounds for denial of discharge. *Barclays/American Bus. Credit v. Adams (In re Adams)*, 31 F.3d 389 (6th Cir. 1994); *Bennett v. Hollingsworth (In re Hollingsworth)*, 224 B.R. 822 (Bankr. M.D.Fla. 1988); *Ricnick's Fitness Ctr., Inc. v. Hicks (In re Hicks)*, 71 B.R. 508 (Bankr. D.N.H. 1987); *Eckard Brandes, Inc. v. Riley (In re Riley)*, 2004 WL 2370640 (Bankr. D. Hawaii 2004).

[18]*Bonham,* 224 B.R. at 116.

one year of the date his chapter 7 petition was filed, with the intent to hinder and defraud BNC. Hoffmann's discharge will be denied pursuant to 11 U.S.C. § 727(a)(2).

Hoffman's Counterclaim

The defendant filed a counterclaim for sanctions under 11 U.S.C. § 362(h). He contends the plaintiff's act of filing its adversary complaint violated the automatic stay provisions of 11 U.S.C. § 362(a)(1). The plaintiff did not violate the automatic stay by filing an action to except debts from discharge and to have the defendant's discharge denied. These types of claims are contemplated by the Bankruptcy Code and must be determined by the bankruptcy court.[19] Defendant's counterclaim is meritless and will be dismissed with prejudice.

Conclusion

Bernd Hoffmann has failed to properly account for loans his wholly owned corporation received from BNC and Northrim Bank for investment in the Central Park partnership. He also fraudulently transferred assets from his corporation to a corporation wholly owned by his wife within one year of his bankruptcy filing. Hoffmann's obligations to BNC will be excepted from discharge and his discharge will be denied. An order and judgment will be entered consistent with this memorandum.

---

[19] 11 U.S.C. §§ 523(c), 727(c).

9

DATED: August 8, 2006.

                BY THE COURT

                /s/ Donald MacDonald IV
                DONALD MacDONALD IV
                United States Bankruptcy Judge


Serve:  E. Sleeper, Esq.
        W. Artus, Esq.
        P. Gingras, Adv. Case Mgr. - served 8/8/06 – pg.


       8/9/06

10